UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENDRA POSTELL,                              Case No. 19-10764

                Plaintiff,        Paul D. Borman
v.                                           United States District Judge

COMMISSIONER OF SOCIAL                       R. Steven Whalen
SECURITY,                                    United States Magistrate Judge

           Defendant.
_____/

**REPORT AND RECOMMENDATION**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 17, 21)**

Plaintiff Kendra Postell ("Plaintiff") brings this action under 42 U.S.C. §

405(g) challenging a final decision of Defendant Commissioner denying her

application for Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI") under the Social Security Act.  Parties have filed cross-motions for

summary judgment which have been referred for a Report and Recommendation

pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons discussed below, I

recommend that Plaintiff's Motion for Summary Judgment (ECF No. 17) be

**DENIED**, and that Defendant's Motion for Summary Judgment (ECF No. 21) be

**GRANTED**.

1

## I.    PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on July 23, 2010, alleging disability as of December 31, 2004.  (Tr. 751).  After an administrative hearing, Administrative Law Judge ("ALJ") Anthony Smereka denied Plaintiff's application on September 28, 2012.  (Tr. 748-764).  After the Appeals Council denied plaintiff's request for review, she filed suit in this Court on March 26, 2014.  (Case No. 14-11244). Plaintiff was partially successful; her case was remanded back to the Commissioner for further proceedings.  (Tr. 779-81).

On November 4, 2015, the Appeals Council issued its Notice of Order of Appeals Council Remanding Case to Administrative Law Judge. Addressed in this Order was a directive to create one electronic file, combining a new application filed by Kendra Postell for SSI benefits in June 2014, with the remanded case.  (Tr. 820).

After a second administrative hearing, ALJ Smereka issued a second unfavorable decision on August 10, 2016.  (Tr. 659-73).  After the decision became the final decision of the Commissioner, plaintiff again filed suit in this Court. Again, her case was remanded back to the Commissioner for further proceedings. (Tr. 1391-93).

The remanded case was combined with another new application filed by Plaintiff.  A third administrative hearing was held on November 27, 2018, in

Livonia, Michigan.  (Tr. 1121).  ALJ Martha Gasparovich presided.  Plaintiff, represented by attorney Eva Guerra, appeared and testified (Tr. 1158-84), as did Vocational Expert ("VE") Helen Topcik (Tr. 1184-88).  On December 21, 2018, ALJ Gasparovich found that plaintiff was not disabled. (Tr. 1144).  Plaintiff did not request a review of the decision with the Appeals Council.  After the decision became the final decision of the Commissioner, Plaintiff filed suit in this Court on March 14, 2019.  (ECF No. 1).

## II.    BACKGROUND FACTS

Plaintiff, born May 6, 1981, was 37 years old on the date of the ALJ's decision.  (Tr. 1141).  She left high school after the 9th grade due to pregnancy. (Tr. 1129).  She has no past relevant work.  (Tr. 1141).  Plaintiff alleges disability as a result of depression and anxiety.

### A.     Plaintiff's Testimony

Plaintiff offered the following testimony:

She lives alone, but her boyfriend comes over to check on her every day. (Tr. 1166).  She does not trust anyone except her boyfriend.  (Tr. 1166-67).  She has four children, ages 16, 18, 19, and 21.  (Tr. 1167).  Her parental rights were terminated as to all of her children.  She does not see her 16 year old daughter, but occasionally sees her adult children. (Tr. 1168).

When she gets angry, she cannot control herself.  She will throw anything within reach at the person with whom she is arguing.  (Tr. 1168-69).  She tried to stab a prior boyfriend during an argument.  She was mentally and physically unable to meet requirements of probation for that incident (anger management, seeing probation once a month), so she went to jail for about three months instead. (Tr. 1169-70).

Plaintiff attempted to explain her depression.  She says she has been through a lot: she lost her mother, lost her children, and she has been in abusive relationships.  (Tr. 1170).  When she feels depressed, she will just sit and watch TV, or the TV will watch her (that is, she won't pay attention to the TV, but it is on).  When she found out her son was in jail she cried for five days and did not eat or sleep.  (Tr. 1171).  She attended one of his court proceedings.  There, she "flipped out on the prosecuting attorney."  (Tr. 1172).  She was asked to leave the courthouse.

She currently takes Prozac, Risperdal, Seroquel, and Trileptal for her mental health issues.  (Tr. 1174).  She testified that she has side effects from the medication: drowsiness and impaired memory.  (Tr. 1175).  Due to the drowsiness, she takes naps during the day.  If she does not nap, she gets very irritated and will get angry.  (Tr. 1176).  She does not leave her house much because she feels

4

people are out to get her or to judge her.  (Tr. 1178).  She normally stays in her pajamas all day because she does not leave her house.  (Tr. 1179).

As for her memory issues, she testified that she has had memory problems since she was a teenager.  She often starts things but does not finish them.  (Tr. 1180).  She says she often has anxiety attacks, especially when sitting with or being around people she doesn't know.  (Tr. 1181).

She dropped out of school in the 10th grade.  She did not go back for her GED because it was "hard to concentrate."  (Tr. 1183).  She struggled concentrating on school work, but she was not in special education.  (Tr. 1184).

B.    Medical Evidence

1.    Treating Records

Plaintiff began treating with Community Network Services ("CNS") for mental health treatment on April 6, 2010.  (Tr. 641).  At the initial visit, she was diagnosed with major depression unspecified, alcohol abuse in remission, and personality disorder not otherwise specified ("NOS").  (Tr. 538).  On mental status examination, she appeared sad and depressed.  She was alert to time, place, and person.  She could remember three out of three objects after three minutes and could count serial 7's with some mistakes.  (Tr. 537).  Plaintiff was started on Lexipro for anxiety and depression, but she had a reaction to that medication.  (Tr. 538).  So, on April 17, 2010, she was started on Fluoxetine and Trazadone.  (Tr.

541).  At that visit, she had a cooperative attitude, and her psychomotor activity

was within normal limits.  She had a dysphoric mood and flat affect.  Her thought

process was goal-oriented and her thought content was normal.  (Tr. 541).

At an August 9, 2010 visit with CNS, her attitude/behavior, mood, affect,

psychomotor activity, speech, through process and content, and

attention/concentration were within normal limits.  Her grooming/hygiene was

adequate and her impulse control was noted as "adequate/WNL."  (Tr. 540).  The

next record from CNS is plaintiff's discharge on February 23, 2011, apparently due

to missed appointments.  (Tr. 553-55).  Plaintiff was seen again by a CNS therapist

in June 2011, but that was her last visit until May 30, 2012.  (Tr. 645).  She wanted

to resume treatment because she was snapping easily, irritable, easily agitated, and

complaining of poor sleep.  (*Id.*).  She was diagnosed with major depressive

disorder single episode unspecified, panic disorder with agoraphobia, alcohol

abuse in remission, tobacco use disorder, and personality disorder NOS.  She had a

GAF score of 60.  (Tr. 648).  She was given Trazadone for sleep and Neurontin for

anxiety and anger.  (Tr. 649).  Mental status examination in June 2011 with CNS

revealed average grooming and hygiene.  Her attitude/behavior, mood, affect,

psychomotor activity, speech, and attention/concentration were all within normal

limits.  Her thought process was goal directed and her thought content was within

normal limits.  Impulse control and judgment were adequate.  (Tr. 651).  Her GAF was 44.  (Tr. 654).

Plaintiff was next seen by a CNS case manager on February 19, 2013, and by a CNS psychiatrist on May 30, 2012.  (Tr. 1080).  She was discharged from CNS on April 23, 2013 for failure to keep appointments.

She returned to CNS for mental health treatment in November 2015.  (Tr. 1069).  On December 2, 2015, plaintiff complained of extreme anxiety and frequent panic attacks.  She said she occasionally felt homicidal, and that she would wake up every hour on the hour.  She complained of mood swings, primarily towards anger.  (Tr. 1069).  She reported that in the past she had gone almost two weeks without taking a shower or performing any grooming.  (Tr. 1070).  At this visit, her mood was angry and anxious with a flat affect.  (Tr. 1071).  Her recent and remote memory were grossly intact and thought process and content were within normal limits.  (Tr. 1072).  Her attention and concentration were also within normal limits.  (Tr. 1073).  She had a GAF score of 50.  (Tr. 1077).  At that time she was abusing alcohol.  (Tr. 1078).  She was seen again at CNS on December 15, 2015.  Her attitude and affect were within normal limits, but her mood was still anxious, angry, dysphoric, and depressed.  Her recent and remote memory were grossly intact.  (Tr. 1064-65).  She was diagnosed with major depressive disorder, single episode, unspecified; panic disorder with agoraphobia;

bipolar disorder, most recent episode mixed; mood disorder; and personality disorder NOS.  (Tr. 1066).  Her GAF score was 50.  (Tr. 1067).  On January 15, 2016, plaintiff's mental status exam was largely the same (unremarkable), (Tr. 1057-60), and she reported doing better with no racing thoughts, not being angry, and sleeping better.  (Tr. 1056).

On May 19, 2016, Chastidy Miller, LLMSW, from CNS provided a statement.  She opined that any of plaintiff's "symptoms or issues related to working are not due to any issues with substance abuse, and are related to her mental health diagnosis."  (Tr. 1109).  On May 25, 2016, Ms. Miller completed a "mental impairment questionnaire."  Dr. Dosyng Yoon co-signed the opinion.  At that time, plaintiff was still treating with CNS.  After listing plaintiff's signs and symptoms, Ms. Miller and Dr. Yoon indicated that plaintiff did not have reduced intellectual functioning.  They also indicated that plaintiff was markedly limited in maintaining social functioning, and moderately limited in activities of daily living and concentration, persistence, or pace.  (Tr. 1115).  They opined that plaintiff would be absent from work more than four days per month due to lack of a car, unstable housing, and because plaintiff had not yet found a "baseline" regarding her symptoms.  (Tr. 1116).

On August 9, 2016, plaintiff's attitude and behavior were normal, but she presented to CNS with a depressed and anxious mood.  Her remote and recent

memory were within normal limits. (Tr. 1704-05). Plaintiff was discharged again from CNS in March 2017 (Tr. 1817), and re-started in September 2017. In September, she presented with a normal attitude and affect, but an anxious, angry, and depressed mood. Her recent and remote memory were grossly intact. (Tr. 1811). Her attention and concentration were normal, and her impulse control and judgment were adequate. (Tr. 1812). She was diagnosed with panic disorder with agoraphobia (rule out); bipolar I disorder, most recent episode mixed, severe with psychosis; and personality disorder NOS. (Tr. 1813). Major depressive disorder was ruled out. At her November 2017 visit, she reported doing well, denied being paranoid, and was compliant with medication which helped her symptoms. (Tr. 1798). On mental status exam, her attitude, mood, affect, memory and attention/concentration were normal. (Tr. 1802-03). In April 2018, she reported feeling depressed and stated she had been off her medication for a few months. Her mental status exam was the same, except she presented with a depressed mood. (Tr. 1793-94).

Plaintiff also struggles with some back pain caused by a car accident in 2012. In September 2016 she underwent an MRI which showed normal lumbar and sacral spine. The thoracic spine had minimal rotoscoliosis. (Tr. 1732). Plaintiff then began treating with pain specialist Dr. Hussain. At her first visit, she had tenderness at L2-L5. Lumbar facet loading test was positive and she had painful

range of motion with extension. Otherwise, gait and motor strength were normal.

Dr. Hussain prescribed Tramadol and Zeneflex. (Tr. 1723). By December 19,

2016, plaintiff reported that the medication had been helping; her pain was

controlled with medication. (Tr. 1728).

Plaintiff's primary care physician during the latter part of the relevant period

was Dr. Steven Zalla, D.O. As the ALJ noted, treatment records from Dr. Zalla

dated through September 2017 are handwritten and largely illegible. (Tr. 1142;

Exhibit 41F, 45F). It appears plaintiff was treated for a variety of acute physical

issues such as chest congestion and gastrointestinal problems, and was prescribed

pain medication such as Motrin.

### 2. Consultative and Non-Examining Sources

On April 4, 2006, Oakland Family Services conducted an intake assessment

for mental health treatment. Plaintiff was diagnosed with dysthymic disorder early

onset with atypical features, alcohol dependence, and post-traumatic stress

disorder, acute. (Tr. 625).

On October 3, 2006, plaintiff underwent her first psychological consultative

examination, with Dr. Zerba. On mental status examination, Dr. Zerba noted that

plaintiff was depressed and anxious with a blunted affect; reality testing was intact;

insight and judgment were "fair-poor;" stream of mental activity was slow and

fairly well-organized. (Tr. 511). Plaintiff's memory was oriented in all three

spheres; she was able to repeat 5 numbers forward and 3 numbers backward, recalled two of three objects three minutes later, and she was able to name past presidents and her birthday. (Tr. 512). Further, she could calculate serial 7s and do multiplication. (*Id.*). Dr. Zerba diagnosed major depressive disorder, panic disorder without agoraphobia, alcohol abuse, and personality disorder not otherwise specified.

On October 9, 2006, State Agency reviewing physician Dr. Rom Kriascuinas rated plaintiff's degree of functional limitation (the "B" criteria under Listing 12.04, discussed below). He found mild limitation in restriction of activities of daily living. (Tr. 525; 529-30). He concluded that plaintiff was capable of doing unskilled work on a sustained basis, that she was moderately limited in her ability to remember and carry out detailed instructions, to maintain attention and concentration for extended periods. She was also found moderately limited in her ability to interact with the general public, to maintain socially appropriate behavior, and to respond to changes at work. (Tr. 531).

On October 23, 2009, plaintiff underwent a psychological evaluation referred by the referee in the child custody case, conducted by Katherine L. Conti, M.A., LLP. Ms. Conti noted plaintiff's difficulty in maintaining employment and caring for her children. (Tr. 614-15). She also noted that Plaintiff was able to read

at the high school level.  The remainder of the opinion is relevant to the child custody case.

On February 10, 2011, plaintiff underwent a psychological evaluation with Dr. Douglas Park, Ph.D.  She was referred for this evaluation by the child custody case referee to aid in determining the best interests of the children.  Plaintiff reported that she had not worked more than a month since 2005 when she was fired for credit card fraud, but she denied any other work-related problems.  (Tr. 544). She reported that her depression had gotten better since starting medication.  She reported having crying spells about three times a month.  (Tr. 546).  Plaintiff was dressed appropriately, and her grooming and hygiene were adequate.  Her long- and short-term memory appeared intact.  Her speech was clear and she displayed a full range of emotion.  (Tr. 546).  Plaintiff's profile suggested that she was immature, impulsive, and had difficulty learning from her experiences.  She was found to be suffering from depression and anxiety.  (Tr. 547).

On June 13, 2011, Dr. Van Horn, Psy.D. conducted a psychological evaluation, which included intelligence testing.  Plaintiff reported her educational history as described above, and added that her grades were "fairly decent."  (Tr. 563).  At the time of this evaluation, plaintiff was homeless, staying with different friends.  She described her day as watching television and playing video games. She took care of her own grooming and hygiene, but did not help with chores.  (Tr.

564).  On mental status exam, plaintiff was appropriately dressed and clean.  She was quiet and cooperative, polite.  Her immediate and remote memory were adequate.  She was able to repeat five digits forward and three backward.  She could recall three items immediately, but two items after three minutes.  Her thoughts were goal-oriented and followed a logical progression.  (*Id.*).  Her mood and affect were "congruent to the topic at hand."  She had poor fund of general knowledge, but had no difficulty with simple addition, subtraction, multiplication and division.  Her ability to pay attention was adequate; she was able to focus on and answer questions.  She was also able to do serial subtractions by 7, 3, and 2.  (Tr. 565).  On intelligence testing, she had a full scale IQ of 66, which is in the Extremely Low range of mental functioning.  (Tr. 567).  Her verbal comprehension and perceptual reasoning scores placed her in the Borderline range.  In academic functioning, her reading and arithmetic were at the 8th grade level, while her spelling was at the 9th grade level.  (*Id.*).  Dr. Van Horn concluded that plaintiff had the ability to relate to others including co-workers, supervisors, and the general public in a work-related environment; that she had the mental ability to understand, remember, and carry out simple and complex tasks; that her ability to maintain attention, concentration, persistence, and pace when performing routine, well-learned tasks is mildly impaired due to her depressed mood; and that her ability to withstand stress is moderately impaired.  (Tr. 568).

State agency reviewing psychiatrist Dr. Nordbrock issued an opinion on plaintiff's mental functioning.  With regard to the "B" criteria of Listings 12.04 and 12.06, Dr. Nordbrock found mild limitation in restriction of activities of daily living and difficulties in maintaining social functioning.  He found moderate limitation in plaintiff's ability to maintain concentration, persistence, and pace.  (Tr. 583).  In a more elaborated opinion, Dr. Nordbrock found only less than marked limitation in any area relevant to the B criteria.  (Tr. 586-87).  He concluded that plaintiff's limitations "do not prevent completion of simple, 1-2 step tasks" with adequate pace and persistence and without excessive supervision.  (Tr. 589).

On March 9, 2012, plaintiff underwent a psychological evaluation with Dr. Leonard Swistak, Ph.D.  During the examination, plaintiff was "significantly depressed" and visibly upset and sad through most of the interview.  Her range of emotion was limited and she appeared to have very minimal interest in life.  She had significant difficulty concentrating and focusing during the interview, which Dr. Swistak attributed to her depression.  Plaintiff was alert and oriented to person, place, time, and circumstance.  Her fund of knowledge was adequate.  Dr. Swistak noted that plaintiff appeared uncomfortable during the interview due to her depression and her difficulty with socially relating with others.  Her anxiety affected her attention and concentration.  Plaintiff's cognitive functioning appeared

to fall within the low average to average range.  (Tr. 592).  Dr. Swistak diagnosed

bipolar disorder – depressed type with psychotic features as well as generalized

anxiety disorder with panic attacks.  He concluded that plaintiff was unlikely to be

able to maintain employment due to her anxiety around others.  "Her difficulties

with attention/concentration and memory make it extremely difficult for her to

efficiently process information and to recall key facts when later required to do

so."  Plaintiff would find it extremely difficult to learn new information and recall

the sequential nature of tasks.  (Tr. 593).  Dr. Swistak concluded that plaintiff was

not capable of working.  (*Id.*).

On December 8, 2015, plaintiff underwent physical and mental consultative

examinations.  Dr. Leonidas Rojas completed the physical consult.  During the

physical examination, she complained that her lower back gets "somewhat sore

after prolonged sitting or standing."  (Tr. 1034).  On physical examination, plaintiff

was well nourished and in no distress.  She had no difficulty standing from a chair

or getting on and off the examination table.  There was no edema or arthropathies

in her extremities, and reflexes were all normal.  (Tr. 1035, 1037).  Dr. Rojas

completed a medical source statement.  He opined that plaintiff could frequently

lift and carry up to 20 pounds, and occasionally lift and carry up to 50 pounds.  (Tr.

1041).  She could sit for four hours, and stand and walk for three hours at a time.

In an eight-hour workday, she could sit for 7 hours, stand for 5 hours, and walk for

4 hours.  (Tr. 1042).  Dr. Rojas found no significant physical limitations; he noted

that any work limitations had to do with "mental issues."  (*See, e.g.* Tr. 1044).

Melissa Rosenzweig, MA LLP, conducted the psychological consultative

examination, co-signed by Terrance Mills, Ph.D.  At the exam, Plaintiff reported

that she could attend to household chores and personal care independently, but was

struggling with depression, anxiety, and anger.  (Tr. 1049).  She was polite and

anxious at times during the interview.  Insight and judgment were fair, but she was

emotionally labile and tearful.  Stream of mental activity was normal.  She had a

flat affect and an "irritated mood."  On memory testing, she repeated 6/6 numbers

forward and 4/6 backward; she was able to recall 2/3 objects after three minutes;

she named four past presidents; she recalled two large cities and two famous

people.  A page is missing from this report, which appears to include part of Ms.

Rosenzweig's opinion.  (*See* Tr. 1050-51).  From what can be read, she opined that

Plaintiff's ability to understand, retain, and execute basic routine tasks was mildly

impaired and that she would be able to perform simple one-step repetitive tasks.

Plaintiff's ability to appropriately interact with the general public or respond to

supervision was moderately impaired.  (Tr. 1051).  Ms. Rosenzweig also provided

a medical source statement on Plaintiff's ability to do work-related activities.  She

found Plaintiff to have mild impairment in the ability to understand, remember,

and carry out simple instructions and to carry out complex instructions and make

judgments.  (Tr. 1052).  Ms. Rosenzweig found mild limitation in Plaintiff's ability to interact appropriately with the public, but moderate limitation in interacting appropriately with supervisors and co-workers, and to respond appropriately to usual work situations and changes in a routine work setting.  She viewed Plaintiff's problems with sustaining relationships, panic, anxiety, and depression as chronic and ongoing.  (Tr. 1053).

Plaintiff underwent consultative examination with Elaine Tripi, Ph.D., on April 8, 2016.  Plaintiff achieved a full scale IQ score of 68, which placed her in the extremely low range of intelligence.  (Tr. 1089).  Plaintiff's spelling and math were at the third grade level, while her reading was at the sixth grade level.  Dr. Tripi diagnosed major depression with anxiety, "extremely low range of intellectual functioning," and stated plaintiff was "unable to work due to emotional difficulties, alienated and withdrawn, health/financial concerns, homeless."  (Tr. 1090).  In a mental residual functional capacity opinion, Dr. Tripi concluded that Plaintiff had moderate limitation in the ability to understand and remember short and simple instructions, but marked limitation in understanding or remembering detailed instruction.  Plaintiff was moderately limited in carrying out very short and simple instructions, extremely limited in carrying out detailed instructions, and markedly limited in maintaining attention and concentration for extended periods. Dr. Tripi opined that Plaintiff had extreme limitation in the ability to work within a

schedule and maintain regular attendance.  (Tr. 1093).  Dr. Tripi further opined that

Plaintiff would have marked limitation in working without special supervision and

in close proximity to or in coordination with others without being distracted.  She

found that Plaintiff would have extreme limitation in completing a normal workday

and work week without interruptions from her psychological problems.  Dr. Tripi

found moderate to marked limitation in social interaction.  (Tr. 1094).

On May 13, 2016, Plaintiff met with Dr. Erik Makie, Psy.D. for a

psychological examination.  Her affect was subdued and restricted, and she

appeared depressed during the exam.  On memory testing, she was able to recall

four numbers forward and two backward, she could remember 0/3 objects after

three minutes, and she could only recall two presidents.  She was largely unable to

do mathematical problems she had been previously able to complete.  (Tr. 1102).

On intelligence testing, Plaintiff's full-scale IQ was 65.  Dr. Makie took care to

explain that, "given her overall presentation today and her tendency to put forth

rather inconsistent effort and give up easily on tasks, her true abilities are likely

slightly higher than indicated here and most likely reflect borderline intellectual

ability."  (Tr. 1104).  Dr. Makie's opinion was that Plaintiff's ability to

understand, attend to, remember, and carry out simple work-related instructions

was mildly impaired.  He opined that more complex tasks would likely be difficult

for her.  He also opined that her ability to respond appropriately to co-workers and

supervision and to adapt to change and stress in the workplace were likely

moderately impaired.  (Tr. 1104, 1105-06).  He diagnosed depressive disorder with

panic attacks and borderline intellectual functioning (rule out intellectual

disability).

Plaintiff underwent another psychological consultative examination on July

4, 2017 with Shelley Galasso Bonanno, M.A.  While reviewing her treatment and

medication history, Plaintiff told Ms. Bonanno that she had been inconsistent with

her medication, adding that she had just gotten out of jail that March.  (Tr. 1757).

Plaintiff presented with poor self-esteem and poor insight.  She could repeat five

numbers forward and three numbers backward.  She remembered 3/3 objects three

minutes later.  She could name two presidents and give her birthdate.  She was

unable to perform serial 7's at this examination.  (Tr. 1759-60).  Ms. Bonanno

diagnosed bipolar I disorder, most recent episode unspecified; alcohol use disorder

in remission; and unspecified personality disorder.  She stated that Plaintiff's

prognosis was poor.  (Tr. 1761).

Plaintiff underwent a final consultative examination with Dr. Sollars at the

behest of her attorney on October 26, 2018.  Plaintiff reported that she had trouble

controlling her anger.  She also reported that she did not have any friends or a

social life, and that she had difficulty going outside and leaving her home.  When

she leaves, she said that she feels that she has to watch her back, her heart races,

and she feels like her chest is caving in.  (Tr. 1768).  On activities of daily living,
Plaintiff reported that she needs help with household chores, that she will often
forget the task she is doing and will not complete the chore.  She said her
medication causes difficulty with concentration and makes her fatigued.  (Tr.
1769).  Dr. Sollars made the following observations: Plaintiff presented with an
anxious affect and cooperative mood; she was appropriately dressed; she was
oriented to person, place, time, and situation; eye contact was appropriate; speech
was normal; she seemed paranoid during the interview.  (Tr. 1770).

Dr. Sollars conducted the Brief Cognitive Status Exam.  Plaintiff's cognitive
functioning was in the "very low range."  He concluded based on this score that
Plaintiff "may have difficulty attending to and holding information in short-term
memory while performing some operation or manipulation with it and then
correctly producing the transformed information."  (Tr. 1771).  Plaintiff was
administered memory testing as well.  She scored "extremely low" in auditory,
visual, immediate, and delayed memory, and "borderline" in visual working
memory.  (Tr. 1772).  Depression and anxiety testing revealed moderate depression
and severe anxiety.  (Tr. 1775).  Dr. Sollars diagnosed post-traumatic stress
disorder, moderate persistent depressive disorder, and generalized anxiety disorder.
He rated Plaintiff's ability to complete or handle a number of job-related
circumstances: he rated her ability to follow work rules, use judgment, and

maintain attention and concentration as "fair."  He rated her ability to relate to co-workers, deal with the public, interact with supervisors, deal with work stress, and function independently as "poor to none."  He concluded that plaintiff had poor cognitive and memory abilities and she could not handle work stress due to emotional instability.  (Tr. 1779).  Dr. Sollars further opined that Plaintiff's ability to understand, remember, and carry out complex or detailed instructions was poor to none (meaning "no useful ability to function in this area" in this context), but her ability to handle simple instructions was fair.  He also opined that Plaintiff was unable to leave the house due to anxiety and unable to drive due to her medications.  (Tr. 1780).

C.     The ALJ's Decision

Citing the medical records, ALJ Gasparovich found that Plaintiff experienced the severe impairments of "adjustment disorder with mixed emotional features; alcohol abuse;[1] major depressive disorder; personality disorder; posttraumatic stress disorder ("PTSD"); generalized anxiety disorder; bipolar disorder; panic disorder; borderline intellectual functioning; status-post open reduction and internal fixation ("ORIF") of the left humeral shaft; and degenerative

---

[1] Although a severe impairment, the ALJ clarified that Plaintiff's alcohol abuse was a contributing factor but not material to a finding of disability, and that multiple medical sources had found that Plaintiff's alcohol use had no effect on her mental symptoms.  (Tr. 1124).

disc disease," but that none of the impairments met or medically equaled a listed

impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 1124-29).  The

ALJ found that Plaintiff experienced moderate limitation in understanding,

remembering, or applying information; concentrating, persisting, or maintaining

pace ("CPP"); and adapting or managing oneself.  The ALJ found marked

limitation in interacting with others.  (Tr. 1125-26).  The ALJ also found that

plaintiff's alcohol use had no effect on her mental symptoms.  She found that

Plaintiff retained the Residual Functional Capacity ("RFC") for exertionally

medium work with the following additional limitations:

> [S]tand and walk up to six of eight hours; could
> lift up to 50 pounds occasionally and 25 pounds
> frequently; would be limited to simple routine one to
> three step instructions in a low stress environment
> defined as no quick decision making and no quick
> judgment required on the job; no interaction with the
> public; only rare interaction (meaning no more than 10
> percent of the workday) with coworkers and supervisors;
> and she would be unable to perform jobs that are fast
> pace, high production, or frequent changes in task
> expectations or locations.

(Tr. 1129).

The ALJ rejected Plaintiff's alleged degree of psychological and physical

limitation.  (Tr. 1130).  The ALJ cited the largely unremarkable mental status

examinations, including normal memory and normal attention and concentration,

and Plaintiff's statements of improvement of mental symptoms with therapy and

compliance with medications.  She also cited the rather large number of opinions in the record that were less restrictive than the RFC.

## III.    STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. § 405(g); *Sherrill v. Secretary of Health and Human Services*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the

ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV.    FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. § 416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984).

## V.    ANALYSIS

A.    <u>Listings</u>

In Plaintiff's first argument for remand, she contends that her mental impairments meet or medically equal the criteria for disability under listings 12.04, 12.05, and 12.06. (ECF No. 17). She points to evidence in the record she believes establishes her disability and insists the ALJ's decision otherwise is not supported by substantial evidence.

"At the third step of the administrative analysis, a claimant meeting or medically equaling the requirements of a Listed Impairment will be deemed conclusively disabled, and entitled to benefits." *Reynolds v. Commissioner of Social Security*, 424 Fed. Appx. 411, 414, 2011 WL 1228165, *2 (6th Cir. April 1, 2011); 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the SSA considers to be 'severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.'" *Id.* (*citing* 20 C.F.R. § 404.1525(a)).

1.      Listings 12.04 and 12.06

Listings 12.04[2] and 12.06 require satisfaction of A and B criteria, or A and C criteria. The ALJ did not address the A criteria, and plaintiff does not argue that she meets or medically equals the A or C criteria. Thus, only the B criteria will be

---

[2] The listings discussed herein are those effective on the date of the ALJ's decision.

discussed.  Listing 12.04 - Depressive, bipolar and related disorders, and Listing

12.06 - Anxiety and obsessive-compulsive disorders, B criteria are as follows:

> B. Extreme limitation of one, or marked limitation of
> two, of the following areas of mental functioning (see
> 12.00F):
>
> 1. Understand, remember, or apply information (see
> 12.00E1).
>
> 2. Interact with others (see 12.00E2).
>
> 3. Concentrate, persist, or maintain pace (see 12.00E3).
>
> 4. Adapt or manage oneself (see 12.00E4).

The ALJ found Plaintiff to have a moderate limitation in understanding,

remembering, or applying information.  (Tr. 1125).  She cited Plaintiff's borderline

intellectual functioning diagnosis, her ninth-grade education without special

education, and grossly intact memory during mental status exams with CNS.  The

ALJ also cited three psychological consultative examinations in which Plaintiff

was found to have the ability to understand, remember, and carry out simple tasks,

or a mild limitation in this area—dated June 2011, December 2015, and May 2016.

Plaintiff cites her three full-scale IQ scores that were below 70 in an attempt to

show she meets or equals this criterion.  She also points to memory testing

conducted by Dr. Sollars, who found mostly "extremely low" memory functioning.

Dr. Sollars opined that Plaintiff "may have difficulty attending to and holding

information in short-term memory" while performing tasks.  (ECF No. 17,

PageID.1921-22).

In my view, the ALJ cited substantial evidence in support of her conclusion

that Plaintiff was only moderately impaired in this area.  While Plaintiff cites Dr.

Makie's full-scale IQ score of 65, Dr. Makie opined that Plaintiff was only mildly

impaired in understanding, remembering, or applying information.  (Tr. 1104).

Plaintiff also cites Dr. Tripi's IQ testing, which resulted in a score of 68.  But Dr.

Tripi opined that Plaintiff had moderate limitation in the ability to understand and

remember short and simple instructions, and that Plaintiff was moderately limited

in carrying out very short and simple instructions.  (Tr. 1093). These conclusion

after intellectual functioning testing undermine the idea that plaintiff is markedly

limited in this area.  Further opinions support the ALJ's decision.  *See* Tr. 1051

(Ms. Rosenzweig's consultative opinion that Plaintiff was mildly impaired in this

area); Tr. 586-87 (State agency reviewing psychologist's "B" criteria opinion); Tr.

568 (Dr. Van Horn's June 2011 opinion that Plaintiff had the ability to understand,

remember, and carry out simple and complex tasks)).  Moreover, Plaintiff's normal

mental status examinations on recent and remote memory with CNS support the

conclusion that Plaintiff is no more than moderately limited in her ability to

understand, remember, and carry out tasks.  In addition, as late as July 2017,

during a consultative examination with Ms. Bonanno, Plaintiff was able to recall

3/3 objects after three minutes, could repeat five numbers forward and three numbers backward.  (Tr. 1759-60).  This evidence supports the ALJ's decision that Plaintiff is only moderately impaired in this area.

In interacting with others, the ALJ found Plaintiff to be markedly impaired. She cited Plaintiff's history with mood swings and uncontrolled anger, isolative behavior, inability to trust others, and anxiety when around unfamiliar people, among other things.  However, the ALJ noted that Plaintiff was able to work as a cashier in 2005, which required interaction with others.  The ALJ also noted references to Plaintiff's friends, her cooperativeness at examinations, being polite during exams, and generally cooperative or normal mood on mental status exam with CNS.  (Tr. 1125).  Plaintiff did not directly challenge the ALJ's decision here. Suffice it say, substantial evidence supports the decision.  Plaintiff's treating therapists at CNS never opined that she was extremely limited in interacting with others.  On the contrary, they repeatedly found generally cooperative or normal attitude, although she often had an anxious or depressed mood.  (Tr. 540, 541, 651, 1064, 1704, 1802-03).  Most notably, her treating psychiatrist at CNS, Dr. Yoon, opined that Plaintiff was markedly limited in social functioning, not extremely limited.  (Tr. 1115).  And, the ALJ was correct in noting that Plaintiff often presented to her consultative examinations as polite or cooperative.  (*See, e.g.*, Tr. 541, 564, 1050, 1770).  Though the record plainly reveals that Plaintiff suffers

28

from serious interpersonal/social obstacles, the record supports the ALJ's decision that Plaintiff does not have extreme limitation in this area, and thus is not disabled by these issues.

In concentrating, persisting, or maintaining pace ("CPP"), the ALJ found moderate limitation. She inferred that Plaintiff's psychiatric symptoms (such as depression, anxiety, mood swings, paranoia, racing thoughts) would negatively affect her concentration and persistence. But, consultative examinations and mental status exams with CNS showed adequate, normal, or mildly impaired ability to maintain CPP. (Tr. 1126). In response, Plaintiff again points to Dr. Sollars' memory testing and her "extremely low" scores as support as support for marked limitation in this area. While she was able to do math problems and serial counting early on, Plaintiff insists that her ability to complete these tasks worsened over time. Dr. Bonanno noted that Plaintiff was unable to perform serial 7's and could not calculate 6 x 4 in July 2017. (ECF No. 17, PageID.1922-23).

The ALJ's CPP decision is supported by substantial evidence. It is true that Plaintiff was not able to substantially complete serial counting or math problems in July 2017. However, there are two consultative examinations in which she was able to substantially complete these tasks—consultative exams in October 2006 (Tr. 512) and June 2011 (Tr. 565), supporting the ALJ's decision, against one in which she could not complete the tasks (Tr. 1759-60). But whether or not plaintiff

can complete math problems or her "extremely low" scores on memory testing

present some evidence that Plaintiff meets this criterion, I

note that notwithstanding these scores, substantial evidence in the

record that the ALJ relied on supports her decision.  Concentration, persistence, or

maintaining pace "refers to the abilities to focus attention on work activities and

stay on task at a sustained rate."  20 C.F.R. § Pt. 404, Subpt. P, App. 1 §

12.00(E)(3).  Medical opinions in the record show less than marked limitation in

this area.  In June 2011, Dr. Van Horn concluded that plaintiff's ability to maintain

attention was mildly impaired (Tr. 568).  In May 2016, Dr. Makie opined that

plaintiff's ability to carry out simple instructions was only mildly impaired.  (Tr.

1104).  Dr. Sollars rated plaintiff's ability to follow work rules, use judgment, and

maintain attention and concertation as "fair."  (Tr. 1779); (*See also* Tr. 1051 (Ms.

Rsoenzweig's opinion); and Tr. 583 (Dr. Nordbrock's opinion)).  And finally, as

the ALJ noted, plaintiff's treating psychiatrist and therapist at CNS repeatedly

rated her attention and concentration as normal.  (Tr. 540, 651, 1057-60, 1065,

1073, 1803, 1812).  These records provide substantial evidence in support of the

ALJ's decision that Plaintiff is only moderately impaired in CPP.

Plaintiff does not argue error in the fourth and final area—attending to and

managing oneself.

Overall, substantial evidence supports ALJ's decision on the "B" criteria of listings 12.04 and 12.06.

2.      Listing 12.05

Plaintiff argues that she satisfies the "B" criteria of listing 12.05 - Intellectual disorder.  The B criteria is as follows:

> B. Satisfied by 1, 2, and 3 (see 12.00H):
> 1. Significantly subaverage general intellectual functioning evidenced by a or b:[3]
>
> a. A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; . . . **and**
>
> 2. Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:
>
> a. Understand, remember, or apply information (see 12.00E1); or
>
> b. Interact with others (see 12.00E2); or
>
> c. Concentrate, persist, or maintain pace (see 12.00E3); or
>
> d. Adapt or manage oneself (see 12.00E4); **and**
>
> 3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

---

[3] Subsection (b) is not argued in plaintiff's brief.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05(B) (emphasis added).

In addressing 12.05(B)(1), the ALJ found that, although plaintiff's three IQ scores fell below 70, they did not accurately reflect her intellectual functioning. The first IQ score comes from testing conducted by Dr. Van Horn in June 2011.[4] Plaintiff received an IQ score of 66, which places her in the extremely low range of mental functioning. Despite this score, Dr. Van Horn stated that based on Plaintiff's "academic and work skills, as well as her responses and behavior, her estimated true intellectual functioning falls within the low average range." (Tr. 567). Further, Plaintiff's scores placed her at the eighth grade level in reading and arithmetic, and the ninth grade level in spelling. Given Dr. Van Horn's commentary on Plaintiff's likely true intellectual functioning, and Plaintiff's grade-level functioning, it was not unreasonable for the ALJ to conclude that her IQ score of 66 does not satisfy part 1 of the B criteria. (Tr. 1128).

Plaintiff's IQ was again tested in April 2016 by Dr. Tripi. She scored 68. The ALJ gave the score only some weight because Dr. Tripi did not diagnose Plaintiff with any impairment consistent with listing 12.05, suggesting Dr. Tripi

---

[4] The ALJ cited this as dated April 2010, instead of June 2011. Dr. Van Horn completed her evaluation of plaintiff in June 2011. (Tr. 563-67).

questioned the validity of the score.  (Tr. 1128).  Plaintiff does not contest this determination.[5]

The third IQ score of 65 came from Dr. Makie's testing in May 2016.  As noted above, and by the ALJ, Dr. Makie took care to explain that he believed the score was not an accurate reflection of Plaintiff's abilities.  "[G]iven her overall presentation today and her tendency to put forth rather inconsistent effort and give up easily on tasks, her true abilities are likely slightly higher than indicated here and most likely reflect borderline intellectual ability." (Tr.  1104).  For this reason, the ALJ gave the IQ score only some weight.  And, Dr. Makie did not diagnose an intellectual impairment; rather, he noted a "rule out" of intellectual disability.  (Tr. 1104, 1105-06).  Consequently, although Plaintiff's IQ scores technically fell below 70, the ALJ did not conclude that she satisfied part 1.  Given the apparent invalidity of at least two of scores as noted by the examiners, and the weight given to the score from Dr. Tripi, the ALJ's decision in this regard is supported by substantial evidence.

Listing 12.05(B) requires satisfaction of all three subparts in order to qualify as disabled.  Thus, even if Plaintiff's IQ scores met or medically equaled subsection (1) of 12.05(B), she still must satisfy the next two parts, which she does

---

She later contests the weight the ALJ gave to other of Dr. Tripi's opinions, but she did not contest the ALJ's weight determination as it relates to the B criteria of 12.05.  (*See* ECF No. 17, Page[5] ID.1918-19).

not. The criteria in subsection (2) are the "B" criteria of listings 12.04 and 12.06, discussed above. The ALJ's decision regarding the "B" criteria is supported by substantial evidence. This part need not be discussed again here.

Subsection (3) requires evidence of intellectual deficits prior to attaining 22 years of age. Plaintiff believes the evidence demonstrates that she satisfies this subsection. She testified that she was not getting passing grades while in school and that she did not complete her GED because she could not concentrate. Plaintiff also points to the fact that she was physically and emotionally abused starting in her teenage years, and her statements that she started experiencing psychiatric symptoms as a young adult. Finally, she points to her starting drinking and at eleven and alcohol abuse since the age of eighteen to demonstrate intellectual deficits prior to age 22. (ECF No. 17, PageID.1924).

The ALJ is correct that there is no persuasive evidence that any intellectual deficits began before Plaintiff turned 22 years old. (Tr. 1129). First, there simply is no medical evidence from that time in her life reflecting a disorder, and no medical opinion in the record stating that Plaintiff suffered from such since before she turned 22. Notably, her treating psychiatrist opined that Plaintiff did not have reduced intellectual functioning in May 2016, and made no mention of any intellectual deficits being present prior to that evaluation. (Tr. 1115). Second, Plaintiff's failure to complete her GED because of reported difficulty concentrating

does not necessarily equate to a finding that she was suffering from an intellectual deficit.  Plaintiff's statements about her grades in school are inconsistent.  She reported to Dr. Van Horn that her grades were "fairly decent."  (Tr. 563).  But she testified at her administrative hearing that her grades were not passing grades.  (Tr. 1184).  At a prior hearing, she testified that her grades were "C's."  (Tr. 1204-05).  Earning C level grades in school does not evince disabling intellectual deficits.  Finally, while suffering physical and emotional abuse can be traumatic and life-altering, it does not an equate to, or necessarily create, an intellectual deficit.

In sum, the ALJ's decision that Plaintiff's impairments did not meet or medically equal listing 12.05(B) is supported by substantial evidence.

B.    RFC

Plaintiff argues that the ALJ did not have substantial evidence in support of her RFC for medium work with additional limitations.  (ECF No. 17, PageID.1931).  She challenges both the mental RFC and physical RFC.

1.    Mental RFC

Plaintiff's argument begins with a challenge to the ALJ's weight determinations on opinions from treating physician Dr. Yoon at CNS and consultative examiners Drs. Swistak, Tripi, and Sollars.

The ALJ adopted most of Dr. Yoon's June 2016 opinion ("mental impairment questionnaire").   As noted above, the opinion included the following:

Plaintiff did not have reduced intellectual functioning; she was markedly limited in

maintaining social functioning; and moderately limited in activities of daily living

and concentration, persistence, or pace.  (Tr. 1115).  The ALJ gave this portion

"great weight," and accommodated Plaintiff's social functioning impairment in the

RFC by limiting her to no interaction with the public and only rare interaction with

co-workers and supervisors.  (Tr. 1138).  Dr. Yoon further opined that Plaintiff

would be absent more than four days per month.  The ALJ gave this portion of the

opinion little weight because Dr. Yoon cited largely non-medical reasons for this

conclusion.  Plaintiff accuses the ALJ of cherry-picking the evidence to support her

decision when she discounted the absence opinion.  (ECF No. 17, PageID.1935).

There is no error in the ALJ's weight determination.  First, given the ALJ's

lengthy discussion of all the medical evidence and the weight attributed to much of

it, it is wholly inaccurate to say that the ALJ cherry-picked the evidence.  *White v.

Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) ("[W]e see little indication

that the ALJ  improperly cherry picked evidence; the same process can be

described more neutrally as weighing the evidence"); *DeLong v. Comm'r of Soc.

Sec.*, 748 F.3d 723, 726 (6th Cir. 2014) (noting that "cherry picking" allegations

are seldom successful because crediting them would require courts to re-weigh

record evidence).

Second, the ALJ had good reason[6] to discount that opinion—Dr. Yoon based the opinion in part on non-medical reasons.  (Tr. 1138).  An ALJ must provide "good reasons" for discounting a treating physician's opinion as that opinion is entitled to controlling weight if it is supported by and consistent with the medical evidence.  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). Dr. Yoon cited lack of a car and unstable housing as the first two reasons.  The third reason Dr. Yoon noted was that Plaintiff had not yet found a "baseline" regarding her symptoms.  (Tr. 1116).  The inability to get to work and unstable housing are not appropriate bases on which to find disability.  *See* 20 C.F.R. § 404.1566(c).  The ALJ did not specifically mention Dr. Yoon's third reason, the "baseline" reason in the decision.  However, Plaintiff did not discuss it either and did not offer any reason to disrupt the weight determination regarding Dr. Yoon's "baseline" statement.  In further support of the weight determination, the ALJ also cited the CNS records which show improvement in Plaintiff's symptoms with treatment, which the ALJ said suggested that her mental conditions would not be work preclusive.  (Tr. 1138).  On balance, it appears the weight determination is

---

[6] The treating physician rule does not apply to disability applications filed before March 27, 2017.  20 C.F.R. § 404.1520c.  Plaintiff last filed an application for benefits on January 31, 2017.  (Tr. 1121).  Since the claims were all filed before March 27, 2017, the treating physician rule applies.  *See* 20 C.F.R. § 404.1527. However, Plaintiff did not raise a treating physician rule argument as such.  She argued only that the ALJ cherry-picked from Dr. Yoon's opinion.

supported by substantial evidence.  The first two reasons listed for the four-days'

absence opinion are non-medical reasons.  The ALJ also cited Plaintiff's

improvement with treatment. The ALJ's discussion of the other medical evidence,

for example normal mental status examinations and opinions by consulting doctors

and state agency psychologists, are inconsistent with the notion that Plaintiff would

miss four days of work per month because of her mental impairments.  Thus, the

ALJ provided good reasons for giving the opinion only some weight.

The other three opinions come from consultative examining sources.  After

the interview with Plaintiff in March 2012, Dr. Swistak concluded that Plaintiff

was unlikely to be able to maintain employment due to her anxiety around others.

"Her difficulties with attention/concentration and memory make it extremely

difficult for her to efficiently process information and to recall key facts when later

required to do so."  Plaintiff would find it extremely difficult to learn new

information and recall the sequential nature of tasks.  (Tr. 593).  Dr. Swistak

opined that Plaintiff was not capable of working.  (*Id.*).  He provided an RFC

supplemental questionnaire.  He found Plaintiff had moderately severe to severe

limitations in the ability to relate to others, carry out simple instructions, respond

appropriately to supervisors and co-workers, and respond to customary work

pressures.  (Tr. 594-95).

The ALJ gave these opinions only some weight.  She stated:

> Although the overall record supports marked limitations
> in interacting with others, Dr. Swistak's opinions appear
> heavily based on the claimant's subjective reports of her
> symptoms and Dr. Swistak only met with the claimant on
> one occasion. Additionally, the totality of the evidence
> suggests a higher level of functioning, based on the
> claimant's school performance (i.e. no evidence of special
> education), job abilities, and reports of improvement with
> treatment. Additionally, the issue of whether a claimant
> can or cannot work is within the special purview of the
> Commissioner of Social Security (20 CFR's [sic]
> 404.1527(d) and 416.927(d)). I also note during Dr.
> Swistak's evaluation, it appears that the claimant was not
> even undergoing mental health treatment as records from
> CNS dated the following month in May 2012 note she
> had not been seen since June 2011 (Exhibit 27F, Pg. 1).

(Tr. 1135).

Plaintiff challenges the ALJ's reliance on the fact that this was a one-time

examination, implying that opinions from one-time examiners can be given great

weight.  (ECF No. 17, PageID.1932).  Noting that this was a one-time examiner

rather than a treating source is a relevant consideration in evaluating a medical

opinion.  *See* 20 C.F.R. § 404.1527(c)(2)(i) (the ALJ is directed to consider the

length of the treatment relationship in evaluating a medical source opinion).  While

the single-meeting length of treatment was properly a factor in the ALJ's decision,

it was clearly not the sole factor in giving the opinion only some weight.  Plaintiff

also argues, later in her brief, that citing her lack of consistency with mental health

treatment was improper.  It was not inappropriate for the ALJ to mention

Plaintiff's lack of consistency with mental health treatment.  It is true that "[f]or

some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009).  However, the Sixth Circuit further stated: "But in this case there is no evidence in the record explaining White's failure to seek treatment during this half-year gap. A 'reasonable mind' might therefore find that the lack of treatment during the pre-November 4, 2002 time frame indicated an alleviation of White's symptoms." *Id.* at 283-84.  Likewise, here, Plaintiff did not offer any explanation, and there is no evidence to explain the periods in which she stopped keeping appointments with CNS.  The ALJ did not find gaps in treatment to indicate improvement in symptoms; rather, she found it weighed against the assertion of debilitating symptoms considering treatment alleviated her symptoms.  And notably, the ALJ did not rely on inconsistency as the sole reason to discount the medical opinion.  Accordingly, the ALJ's consideration of plaintiff's treatment history was not improper.  Plaintiff does not challenge any other part of this weight determination.

The next challenged weight determination is on Dr. Tripi's opinion.[7]  Dr. Tripi conducted intelligence testing, discussed above, and completed a mental RFC assessment.  She opined that Plaintiff was unable to work because of her mental

---

[7] The case was remanded in March 2018 because the prior ALJ neglected to address Dr. Tripi's opinion.

impairments.  (Tr. 1090).  In the RFC opinion, Dr. Tripi rated Plaintiff as having

moderate to extreme limitations with activities related to social interaction, and

moderate to extreme limitations with activities related to adaptation.  (Tr. 1093-

94).  The ALJ gave the opinions only some weight.  She agreed that Plaintiff had

marked limitation in social interaction, but found the record as a whole supported

less severe limitations in other areas of mental functioning.  The ALJ also cited

"sporadic mental health treatment and improvement of symptoms with treatment"

as inconsistent with disabling mental conditions.  (Tr. 1137).

Plaintiff's challenge to the mention of sporadic mental health treatment is

addressed above in the analysis under *White*.  In short, there is no error in the

ALJ's consideration of inconsistent mental health treatment where Plaintiff has not

proffered any evidence to explain gaps in treatment.  Plaintiff appears to also take

issue with the ALJ's statement that the "record as a whole" is inconsistent with Dr.

Tripi's opinion, but she did not marshal evidence that would suggest that ALJ's

decision was not supported by substantial evidence.  Notwithstanding Plaintiff's

dearth of argument on this point, the ALJ's conclusion that the record as a whole

does not support marked and extreme limitation in mental functioning is supported

by substantial evidence.   As explained above in the discussion on the listings, the

evidence supports less than marked limitation in all areas except social

functioning—the point on which the ALJ agreed with Dr. Tripi.  Further, CNS

records showed largely normal mental status examinations throughout treatment.

Other opinion evidence concludes that plaintiff had less than marked limitation in

the subject areas, including the State agency reviewing psychologist in July 2017

(Tr. 1333-34), and her treating psychiatrist (Tr. 1115). Plaintiff is correct that there

is some evidence in the record that supports her argument, but since substantial

evidence supports the ALJ's conclusion on Dr. Tripi's opinion, the conclusion

should stand. *See McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th

Cir. 2006).

The final contested weight determination is the ALJ's conclusion that Dr.

Sollars' October 2018 opinion is entitled to only some weight. As stated earlier,

Dr. Sollars rated Plaintiff's ability to relate to co-workers, deal with the public,

interact with supervisors, deal with work stresses, and function independently as

"poor to none." (Tr. 1779). He also rated "poor to none" in the ability to

understand, remember, and carry-out detailed and complex instructions, but fair in

the ability to do the same with simple instructions. (Tr. 1780). The ALJ agreed

that the evidence supports an inability to complete complex tasks, and the ALJ

limited Plaintiff to very little social interaction in the workday. However, the ALJ

found "no persuasive evidence in the record to support 'poor to none' abilities in

the remaining activities noted by Dr. Sollars." The ALJ noted again that this was a

one-time examination and that Plaintiff improved with compliant treatment at CNS. (Tr. 1140).

Plaintiff's challenge is that "her gaps in treatment should not be counted against plaintiff, given that her disability involves a mental impairment." (ECF No. 17, PageID.1936). She also notes that the ALJ again took note of the one-time examining relationship. (*Id.* at PageID.1935). Again, noting the length of the treatment relationship is appropriate, and required. And discussing Plaintiff's improvement when she attends therapy is also proper, as discussed above. As Plaintiff puts forth no other basis on which to find error here, the weight determination should stand.

Plaintiff next argues that the ALJ did not properly consider medication side effects. (ECF No. 17, PageID.1936-37). The ALJ acknowledged that Plaintiff "alleged significant side effects of drowsiness or memory issues from her medications." However, "CNS records (where the claimant is treated for and prescribed medications for her mental conditions) reflect no reports of same throughout the record. If she experienced debilitating drowsiness, one would expert her to report these symptoms to her treating sources." (Tr. 1141). Plaintiff goes on to list the "common side effects" of her medications taken from www.drugs.com, which include insomnia, drowsiness, and irritability. She argues that although she did not mention that her symptoms were side effects from her

medications, she talked about these symptoms with Dr. Yoon and testified to experiencing side effects. (ECF No. 17, PageID.1937).

Allegations of a medication's side effects *must* be supported by objective medical evidence. *See Farhat v. Sec. of Health & Human Servs.*, 1992 WL 174540, at *3 (6th Cir. July 24, 1991); *see also Bentley v. Comm'r of Soc. Sec.*, 23 Fed. Appx. 434, 435 (6th Cir. 2001) (noting absence of reports by treating physicians that claimant's "medication caused drowsiness as a side effect"); *Donegan v. Sec. of Health & Human Servs.*, 1993 WL 291301, at *7 (6th Cir. Aug. 2, 1993) (noting that no objective medical evidence supported claimant's allegations that his medication made him so drowsy that he was unable to work); *Essary v. Comm'r of Soc. Sec.*, 114 Fed. Appx. 662, 665 (6th Cir. 2004) ("Although Essary testified that she suffered from dizziness and drowsiness as a result of her medications, Essary's medical records make no indication that Essary reported such side effects to any of her physicians.").

The ALJ is correct that the medical records show no complaints of medication side effects. CNS prescribed her medication and treated her mental conditions, but did not note any medication side effects. In her function report, plaintiff noted that medication can cause her nightmares, but did not note other side effects. (Tr. 1614). The Commissioner makes a good point—on at least one occasion, plaintiff complained of insomnia and irritability when she was not taking

medications (which suggests that her complaints of these symptoms were not necessarily tied to medication side effects), and that medications helped those symptoms. (Tr. 645). This belies the contention that she experienced medication side effects, and those side effects were debilitating. Plaintiff is not entitled to reversal or remand on this basis.

Plaintiff's last argument is that the ALJ failed to take into account her GAF scores, which were mostly 50 or below. Plaintiff only "mention[s]" this "because the ALJ noted that these are just 'a brief snapshot in time.'" (ECF No. 17, PageID.1937). She insists that since she had at least twelve GAF scores at 50 or below, the scores reflect functioning for more than just a "brief snapshot in time." (*Id.* at PageID.1937-39). It is not entirely clear what Plaintiff's argument is. To the extent she points to the GAF scores as medical evidence in support of disability, as discussed above, the record amply supports the ALJ's decision with regard to her mental impairments despite the GAF scores. And though the ALJ did not give weight to the GAF scores, she did discuss the scores. (Tr. 1141).

### 2. Physical RFC

Plaintiff believes she should have been given an RFC for less than medium work given the back pain she experiences from a car accident in 2012. Plaintiff says there is no medical opinion in the record on her physical RFC. She reported to Dr. Yoon on one occasion that her back pain was 5/10. She began treating with

a pain specialist in October 2016, who prescribed Tramadol.  She posits that since

she weighed only 110 pounds, it is "incongruous" that she be found capable of

lifting half her weight (up to 50 pounds) for one-third of the workday

("occasionally").  (ECF No. 17, PageID.1939-40).

As an initial matter, there is a medical opinion on Plaintiff's physical

impairments dated December 8, 2015 from Dr. Rojas.  Dr. Rojas found that

Plaintiff could occasionally lift and carry up to 50 pounds, as did the ALJ.  (Tr.

1041).  Dr. Rojas found no significant physical limitations, instead noting that any

limitations had to do with "mental issues."  (Tr. 1044).  The ALJ adopted the

opinion in part, but found that the limitations to frequent use of the right hand,

limited use of the feet, and occasional postural activity were unsupported by

normal physical examination findings.  (Tr. 1142).   Plaintiff does not contest this

weight determination.

Second, the evidence supports the ALJ's decision on Plaintiff's exertional

capabilities.  Plaintiff was prescribed Tramadol on October 12, 2016.  (Tr. 1723).

She reported that her pain was controlled with medication by her next visit on

December 19, 2016.  (Tr. 1728).  In April 2018, Plaintiff reported to Dr. Yoon that

her pain was 5/10, but the writer further noted that Plaintiff was not taking any

medication for pain relief, but took Zanaflex "from time to time."  (Tr. 1792).  If

Plaintiff reported 5/10 pain without medication, and reported that medication

alleviated her pain, then one can infer that with consistent pain medication, Plaintiff would not be more limited than stated in the RFC.  Moreover, objective findings were largely unremarkable.  A November 2012 MRI of the cervical spine revealed central disc herniation and reversal of the mid-lordotic curve "possibly in part due to cervical strain/sprain." (Tr. 1782).  Despite this 2012 finding on the cervical spine, when Plaintiff presented to Dr. Rojas in 2015 for a consultative examination, she complained only of low back pain.  (Tr. 1034).  She complained only of low back pain to her pain specialist as well.  (*See* Tr. 1721).  Other objective testing was largely normal: X-rays of the lumbar and sacral spine in August 2016 were negative, and x-ray of the thoracic spine revealed minimal rotoscoliosis.  (Tr. 1732).  Physical examinations noted tenderness about the lumbar spine and pain on range of motion with extension, but otherwise normal gait and normal motor strength and tone of the upper and lower extremities.  (Tr. 1723, 1727, 1731).  In short, the physical RFC is supported by substantial evidence.

Plaintiff also notes that she underwent ORIF (open reduction and internal fixation) of the left humeral shaft due to a fracture.  Despite this history, there are no medical records containing complaints of complications from the surgery or the fracture, or that would suggest any physical limitations, beyond those stated in the RFC, that are necessary to accommodate Plaintiff's left arm.

Lastly, Plaintiff provides no support for the assertion that a person who weighs 110 pounds cannot complete work at the medium exertional level and lift up to 50 pounds occasionally during the workday.  This is not a basis on which to remand or overturn the ALJ's physical RFC.

As noted earlier, this Court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec*., 474 F.3d 830, 833 (6th Cir. 2006); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).  "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).  In closing, my recommendation to uphold the administrative findings should not be read to trivialize Plaintiff's mental and physical limitations to the extent that her claims are supported by the record. Nonetheless, the ALJ's determination that she was capable of a reduced range of unskilled medium work is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level and should not be disturbed by this Court. *Mullen v. Bowen, supra.*

## VI.   CONCLUSION

For the reasons stated above, I recommend that Plaintiff's Motion for Summary Judgment be **DENIED**, and that Defendant's Motion for Summary Judgment be **GRANTED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d). The response must specifically address each issue raised in the objections, in the

same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: June 23, 2020                          s/R. Steven Whalen
                                             R. Steven Whalen
                                             United States Magistrate Judge


## CERTIFICATE OF SERVICE

I certify that on June 23, 2020, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification and/or United States Postal Service the foregoing pleading to a non-ECF participant.

                                             s/Carolyn Ciesla
                                             Case Manager